IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

D<small>IAZ DE</small> M<small>ORA</small> v. G<small>REATER</small> O<small>MAHA</small> P<small>ACKING</small> C<small>O.</small>

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

M<small>ARIA</small> P. D<small>IAZ DE</small> M<small>ORA</small>, <small>APPELLANT</small>,

v.

G<small>REATER</small> O<small>MAHA</small> P<small>ACKING</small> C<small>OMPANY</small>, I<small>NC</small>., <small>APPELLEE</small>.

Filed October 23, 2018.    No. A-17-799.

Appeal from the Workers' Compensation Court: J<small>ULIE</small> A. M<small>ARTIN</small>, Judge. Affirmed.

James E. Harris and Britany S. Shotkoski, of Harris & Associates, P.C., L.L.O., for appellant.

Dallas D. Jones and Zachary W. Anderson, of Baylor, Evnen, Curtiss, Grimit & Witt, L.L.P., for appellee.

R<small>IEDMANN</small>, B<small>ISHOP</small>, and W<small>ELCH</small>, Judges.

B<small>ISHOP</small>, Judge.

## I. INTRODUCTION

Maria P. Diaz de Mora was injured during the course of her employment at Greater Omaha Packing Company, Inc. (GOP), in May 2013, when she "rolled" her left ankle walking down steps. She sought workers' compensation benefits, alleging the ankle injury led to problems in her left knee, left hip, and her lower back. She claimed she was totally disabled. The Nebraska Workers' Compensation Court found Diaz de Mora had suffered a compensable injury to her left ankle, but that she failed to sustain her burden of proof as to the other claimed injuries. On appeal, Diaz de Mora challenges the admission of certain medical opinions and the court's conclusion that she did not suffer an injury to her lower back. She also takes issue with the court's characterization of a doctor's billing record as a "checklist" which lacked credibility or weight. We affirm.

- 1 -

## II. BACKGROUND

### 1. MEDICAL TREATMENT PRECEDING MAY 2013 INJURY

In July 2007, medical records reflect that Diaz de Mora, age 52 at the time, sought medical care for pain in her left hip. It was noted that the pain was worse when she had to "go up the stairs." In August, she saw an orthopaedic doctor in Council Bluffs, Iowa, who indicated Diaz de Mora had "complaints of left hip pain over the last 8 months," had difficulty sleeping on her left side, and had groin pain, but denied any back pain. The record states she was given Celebrex "3 weeks ago" by her family doctor, and was now seeking an injection. Although a followup appointment was indicated once the "x-ray taken at her family doctor" was available, there were no further records for 2007 received into evidence.

On October 22, 2009, Diaz de Mora saw a doctor at South Omaha Medical Associates, Inc. (SOMA). She was complaining of pain in her feet and left knee pain and swelling. On October 27, she went to see the same orthopaedic doctor who had treated her in 2007. She was complaining of bilateral foot pain which "started several months ago without any trauma." She also complained of "a painful lump on the anterior aspect of the left knee also not caused by trauma." She was diagnosed with bilateral plantar fasciitis and with a mass on her left knee. The doctor "aspirated the prepatellar area," which felt hard and had no fluid. A physical therapy note from November 2009 shows that Diaz de Mora had a 6-month history of bilateral foot pain, right greater than left, and also left knee and hip pain with "MRI results pending." At that time, she was "unable to maintain single leg balance" on her left leg due to knee pain. It was noted that Diaz de Mora "demonstrates signs and symptoms consistent with bilateral plantar fasciitis which is complicated by knee and hip pain. She demonstrates guarded rehabilitation potential given the pending diagnosis of her left knee pain." There are no further records for 2009 despite a reference to upcoming followup appointments for physical therapy and with the treating doctor.

In July 2012, Diaz de Mora was seen for complaints about her back and left leg. A SOMA medical record indicates Diaz de Mora fell on a cooler and hit her knee 3 weeks prior. She developed pain in her left hip, left leg, and knee, and had "pain upon stepping up" and carrying weight. She was noted to be tender in her lower back, with left leg and hip pain. A week later, a SOMA medical record shows her back pain was a "little better" with medication, but she still had left hip and left leg pain. On August 29, a SOMA medical record showed her knee pain was gone, but she was still having low-back pain and hip pain. By mid-September, she was still diagnosed with low-back and hip pain. There are no further records from the SOMA office.

However, in mid-October 2012, Diaz de Mora was seen by Dr. Clifford K. Boese, an orthopedic doctor in the same medical office as the orthopedic doctor who treated Diaz de Mora in 2007 and 2009. Dr. Boese's records show she was being seen for left hip pain, and that she had injured her hip slipping on a step, but she "did not completely fall to the ground." A medical questionnaire indicates the onset of Diaz de Mora's problem was a work injury in June 2012, and that she had no injury to the knee or hip prior to that time. She reported constant pain to the left hip. She had physical therapy for 6 weeks and had some improvement, but her "pain has kind of plateaued." Dr. Boese's record indicates she was having "chronic problems with the left hip," and the pain "is along the low back on the left side near the SI joint, also in the sciatic area," and then

"radiates down the lateral thigh to the knee. The pain does not radiate beyond the knee." Also, "[s]he notices the pain specifically when she steps up on a step or she tries to squat down. Simple standing and walking generally does not cause pain." He noted she had difficulty sleeping on her left side, and that she "[d]oes get some low back pain on the left side." He observed a "very minimal limp on the left side." Dr. Boese thought she may have "torn part of her abductor tendon"; he ordered an MRI.

At the end of October 2012, Dr. Boese's notes say that Diaz de Mora denied any back pain, but there had been no change since her last visit. She continued to complain of left hip pain. Dr. Boese reported that the MRI of the pelvis and hip "does show a partial tear of the gluteus medius tendon near its insertion, left hip." There was also "severe spinal stenosis at L4-L5 level and there are what appear to be bilateral sacral insufficiency fractures." Dr. Boese noted that "[t]here is a history of the patient falling back in about January of 2012 where she landed on her coccyx area." Dr. Boese's impression was that Diaz de Mora's symptoms were from the gluteus tear, not the spinal stenosis or the sacral insufficiency fracture. He injected her left hip and was going to have her do some physical therapy. She was permitted to work without restrictions. She received an injection for pain relief, and also engaged in physical therapy in November.

There are four physical therapy records for November 2012. On November 7, the record states that Diaz de Mora "returns to physical therapy due to persistent complaints of left hip pain." It states that she had been seen for physical therapy in August for the same complaints. "Today, she describes experiencing pain that begins in the left lumbar region and radiates down the lateral aspect of her thigh to her knee. The symptoms are aggravated by climbing stairs, laying on her left side and sitting in a soft, unsupported seek [sic] for longer than 5 minutes." It is noted that Diaz de Mora "complained of left-sided low back pain with a forward step up movement on 8 inch step." Also, "Joint mobilizations at the left L4/L5 facet joint reproduce the patient's symptoms." The physical therapist's assessment was that Diaz de Mora showed "positive signs of left lower extremity referred pain secondary to lumbar degeneration," and that she "would benefit from physical therapy to improve her spinal mobility and stabilization."

The next day, November 8, 2012, the physical therapist noted there was no pain present with the "forward step-up pre-treatment," but there was "[m]ild soreness still present with jt. mobs to left L4/L5." On November 12, Diaz de Mora reported less discomfort with stairs and sitting, but she did experience an onset of left-sided low-back pain while performing household cleaning activities at home. She experienced discomfort mopping and rearranging a clothes drawer. The physical therapist reported that "[g]rade 3 and grade 4 left unilateral pressures at L4/L5 are still painful," and that "[p]oor body mechanics [were] placing increased stress to the patient's lumbar spine." On November 16, Diaz de Mora reported she was still experiencing left-sided low-back pain, but she denied pain with work activities, walking, and stair negotiation. Diaz de Mora's low-back pain was "still reproducible with pressure to the left L4/L5 facet joint." The physical therapist felt that "her spinal stenosis is the primary cause of her remaining symptoms." Diaz de Mora was "educated on a home exercise program for hip and trunk strengthening," and body mechanics for household activities "to ensure a neutral spine position." No further therapy was recommended at that time.

Dr. Boese saw Diaz de Mora on November 26, 2012, for followup on her left hip pain. He noted that she had a "little bit of gluteal tendon tear. She still has some pain if she lies on it but overall she is much better after her injection." She was no longer taking Ibuprofen and had been working without restrictions. Dr. Boese stated that Diaz de Mora's symptoms were under control, but she "would be on the Mobic indefinitely," for use as needed for pain. He said she should continue her home exercise program as taught in physical therapy, but that she had reached maximum medical improvement (MMI) without any permanent impairment. "We did discuss the fact that if she has recurrent pain she may require additional cortisone injections to treat the pain. I would recommend no more than 3 injections per year, however, if they are needed at all."

## 2. MAY 2013 INJURY AND TREATMENT

On May 9, 2013, while at work, Diaz de Mora was "going downstairs shining the light to the ceiling and [she] didn't see that there was one little step." Her left foot stayed "on the little step," but she did not fall, "it just twisted." She did not fall because she held on to a nearby conveyer belt, but her ankle was fractured because she "rolled it over." When seen by Dr. Donald Gammel at WorkFit the day after the accident, Diaz de Mora was treated for pain and swelling of her left ankle and knee; she did not complain about her left hip or lower back. An x ray of her left ankle showed a fracture of the distal fibula and soft tissue swelling; the x ray of her left knee did not reveal any "bony abnormalities," but the doctor noted "fluid in the pelvic bursa" when examining her left knee. Diaz de Mora was placed in a "Cam Walker" (boot) for her fractured ankle and a neoprene sleeve for her knee. She was limited to modified work duty, but did not miss any work. She "was working in the laundry sitting down doing what [she] could only using [her] hands." She sat for 95 percent of the time, and used the boot for 2 to 5 weeks.

Dr. Gammel saw Diaz de Mora seven times between May 10 and July 31, 2013. On May 24, she reported feeling good with the boot on. She was noted to have left knee prepatellar bursitis; the doctor drained a small amount of fluid from the left knee and injected Kenalog into the bursa. She was able to work regular duty. On June 7, Diaz de Mora reported that her left foot "still hurts to walk [without the] boot." By June 21, she reported "doing very well." She still had pain when moving her ankle or foot. The "[p]roblem comes and goes." On July 5, she was still having "a little pain" in her left ankle and foot. An x ray of her left ankle revealed "good callus formation." On July 31, Diaz de Mora reported that "she's doing good. Only has a little pain. Pain is in left ankle and in the left knee." She returned to her job doing "quality control work" about 2 months after her injury. The records do not reflect any complaints to Dr. Gammel about pain in her left hip or lower back during these visits from May 10 to July 31.

However, on September 3, 2013, Diaz de Mora reported to Dr. Thomas Dunbar, another WorkFit doctor, that "she is not fine, having pain in left knee and it goes up to left hip." On September 10, Dr. Jose R. Novoa, also at WorkFit, recorded that when Diaz de Mora was taking prednisone the pain was gone, but when she finished her medications, the pain came back and "is in her left upper leg and hip in [sic] the left ankle/foot." Dr. Novoa recommended a second prednisone taper and some physical therapy. On October 23, Dr. Novoa reported that Diaz de Mora's left foot "is doing great but left hip is still hurting[.]" Dr. Novoa ordered a "MRI lumbar MRI of left hip" to evaluate ongoing discomfort.

- 4 -

On November 15, 2013, an "MRI lumbar spine without contrast" was performed. It showed: "Moderate lumbar spondylosis"; "Moderate/severe spinal canal stenosis at L4-L5"; "Multilevel foraminal narrowing which is most pronounced and moderate/severe on the left at L4-L5 [with] [l]ess pronounced foraminal stenosis elsewhere"; "Facet arthropathy, grade I spondylolisthesis of L4 on L5"; and "Mild remote superior endplate compression fracture at L1." On December 9, "X-ray Flexion and Extension Lumbar Spine Films, Two Images" showed: "Grade 1 anterolisthesis of L4 on L5 increased to Grade 1-2 in flexion" and "[o]ld healed compression deformity superior end plate of L1."

A letter dated December 9, 2013, from Dr. Wendy J. Spangler and Kimberly L. Nelson, PA-C, of Midwest NeuroSurgery & Spine Specialists, states that Diaz de Mora was seen in their neurosurgery clinic on that date. "She presents with complaints of left lower back pain and lower extremity pain following a work accident that occurred on 5/09/2013." The letter indicated that Diaz de Mora described pain in her left-sided lower back and extending into the hip and down the side of her thigh, but not below the knee. She said it bothered her most when sitting and standing up from a seated position, and lying down made the lower back pain and leg pain worse. "She said she did not recall the current pain she is having prior to her injury at work on 5/09/2013." Dr. Spangler reviewed the November 15 lumbar spine MRI and its impressions; she found no "acute findings" and referred Diaz de Mora to a pain specialist for possible epidural steroid injections. "We discussed that the patient's pain is related to her work injury, and this is what we are treating, as she did not have the pain prior to the fall."

A letter dated December 30, 2013, from Dr. Richard G. Belatti, from Medical Pain Center, P.C., stated he saw Diaz de Mora that day. She was complaining of pain in the left hip, knee, and leg, and reported that her symptoms began on May 9 and had gradually worsened. "She does appear to be experiencing a radiculopathy as a result of her spondylolisthesis and stenosis." Dr. Belatti recommended epidural steroids; this was done on January 24, 2014.

The next record from Dr. Novoa is dated February 19, 2014. It states that Diaz de Mora reported that her left knee "is not improved at all," and still has pain and swelling. Dr. Novoa indicated that Diaz de Mora's symptoms were improving in quality, and that the "[p]roblem comes and goes." The symptoms start when Diaz de Mora is at work, and it worsens with moving, "especially when getting up from seated position or when ascending or descending stairs." Diaz de Mora was reported to have "generally been doing well and performing her regular duties," and not taking any medication for pain. Her pain is "very brief" and occurs only during certain movements. "Patient states that she previously received resolution of her symptoms with prednisone." Diaz de Mora was given a steroid oral course at the time of this appointment.

On March 4, 2014, Diaz de Mora reported to Dr. Novoa that she did not have any improvement in her left knee or hip pain, but that she had generally been doing well and performing her regular duties. She was not taking any medication. Dr. Novoa stated that Diaz de Mora appeared to have reached MMI. However, on May 1, Diaz de Mora reported to Dr. Novoa that her left hip pain was getting worse, that the pain was constant and goes down to her knee. She was put on prednisone and a repeat MRI of her hip and of her lumbar spine were ordered.

On June 3, 2014, Diaz de Mora saw Dr. Jeremiah P. Ladd at Nebraska Spine Center, LLP, for evaluation and treatment of lower back and left hip pain. She was referred to Dr. Ladd by Dr.

Novoa. Diaz de Mora reported to Dr. Ladd that her pain began after her May 9, 2013, work injury. "The patient reports that the injury occurred when she fell down the steps while working." She claimed her pain started due to a gait imbalance from wearing an ankle cast. Dr. Ladd summarized Diaz de Mora's prior treatments and tests, and stated, "It is important to note that the first time the patient seemed to note pain going up into the left hip[,] at least from the clinical documentation, was a note from Dr. Thomas Dunbar dated September 3, 2013. This is not quite four months out from her date of injury." Dr. Ladd described the two different MRIs and their findings. He then stated, "Of note, we reviewed today that the patient really does seem to highlight a fairly particular L5 pattern to her pain. This would be consistent with the lateral recess stenosis at the left L4-[L]5 level and, as well, the mild to moderate neuroforaminal stenosis at the L5 to S1 level." He went on to state that "given her mechanism of injury, it makes sense that she has the knee and ankle problems with the above noted diagnoses, however, the findings in the lumbar spine appear to be chronic in nature." Dr. Ladd suggested "one final effort with an injection at the left L5-S1 transforaminal route," home exercise as taught at physical therapy, and over the counter medications. A left L5-S1 transforaminal lumbar epidural steroid injection was done on June 25, 2014, and on July 8, Dr. Ladd's medical record indicated that Diaz de Mora was "quite happy with the result of the left L5-S1 TESI" and was "60 to 80% better." Overall she did not feel pain but sometimes there was pain when walking and climbing stairs but it was no longer as painful as it had been. Dr. Ladd discussed with Diaz de Mora that "she will potentially have intermittent flares of her pain and this would not be abnormal." Dr. Ladd noted that Diaz de Mora had previously been placed at MMI by Dr. Novoa on March 4 and had been working regular duty. Dr. Ladd continued her regular duty with activity as tolerated and no restrictions to the spine.

About 2 years later, Diaz de Mora saw Dr. Margarita Rodriguez Escobar on June 24, 2016. Dr. Escobar's medical record indicates that Diaz de Mora reported "cervical, left shoulder, lumbar spine and left [sic] injury at work 5/09/2013. [A]fter that patient no [sic] able to work. Today coming to discuss FCT's [sic]." Dr. Escobar "agree[s] that patient['s] incapacity is due to her condition after the injury at work on 2013. With limitation to do regular duty only sendentary [sic], these conditions are permanent."

### 3. PETITION AND TRIAL

Diaz de Mora filed a petition seeking workers' compensation benefits on July 1, 2016. Trial took place on September 6, 2017. The parties stipulated that Diaz de Mora was employed by GOP on May 9, 2013, and that she suffered an accident which arose out of and in the course of her employment with GOP in which she injured her left ankle. In addition to testimony from Diaz de Mora and two GOP employees, the record also contains miscellaneous employment and discovery documents, along with medical records detailing Diaz de Mora's medical history before and after the May 9 workplace injury, as set forth above. Additionally, opinions of various doctors were received as evidence.

*(i) Dr. Ladd*

Dr. Ladd's December 23, 2016, opinion states that Diaz de Mora's lower back condition was chronic in nature "due to longstanding degenerative stenosis at L4-L5 and L5-S1," and was "unrelated to anything that occurred on May 9, 2013." His opinion was based upon "her post-accident radiological studies, which reveal longstanding degenerative findings and no evidence of any acute injury," and the "medical records which do not include any mention of left low back or hip problems for nearly four months after her accident," and the fact that medical records show "the same complaints before May 9, 2013, as after."

Dr. Ladd first saw Diaz de Mora on June 3, 2014, and at that time she was complaining of pain between the hip and knee. Dr. Ladd stated, "Her pain was in a fairly particular L5 pattern and was consistent with lateral recess stenosis at left L4-L5, as well as moderate neuroforaminal stenosis at the L5 to S1 level." He added, "Those findings clearly pre-existed May 9, 2013 and are longstanding and degenerative in nature." He was aware that Diaz de Mora was claiming that her left lower back and left hip problems began immediately after the May 2013 accident and that she told her doctors of those problems each time she was evaluated. However, Dr. Ladd stated, "That is not consistent with her medical record." He pointed out that the first mention of any left hip or lumbar complaint was made on September 3, 2013, to Dr. Dunbar, which was "not quite four months out from her date of injury." He would have expected at least one of her providers to have recorded those complaints during "one or more of the numerous records created between May 9, 2013 and September 3, 2013." He concluded the medical records did not support Diaz de Mora's assertion that she injured her left hip and lower back on May 9.

The doctor further noted that once Diaz de Mora began complaining of left hip and low-back problems, "her complaints where the same as the complaints she made before May 9, 2013." He said her "complaints are virtually identical to those recorded" before the May 2013 accident. Dr. Ladd stated that "the manner in which [Diaz de Mora] has complained that her pain limits her since the accident of May 9, 2013, is the same manner in which she complained that it limited her before her accident." For example, he pointed out that in 2012 Diaz de Mora reported problems going up stairs, and that when he evaluated her in July 2014, she described pain when climbing stairs.

In conclusion, Dr. Ladd opined that Diaz de Mora "suffers from chronic degenerative changes to her lumbar spine which cause the symptoms she experienced before her accident, and caused her to experience the same symptoms beginning approximately four months after her accident." He added that her accident "did not aggravate or worsen her chronic degenerative condition," and her "symptoms associated with that condition" since the May 2013 accident "are unrelated to her accident." He pointed out that his July 8, 2014, office note stated that Diaz de Mora "will potentially have intermittent flares of her pain and this would not be abnormal. In fact, that appears to have been her history prior to May 9, 2013 as noted above, and will probably continue to be her history in the future." He concluded that Diaz de Mora did not require any medical care for her lumbar condition as a result of the May 2013 accident, and that she had "no accident-related impairment or limitations." He recommended that she engage in activities as

tolerated given her "chronic degenerative condition and age, primarily to protect her from further exacerbations."

### (ii) Dr. Gammel

Dr. Gammel's March 2, 2017, opinion sets forth a detailed summary of the medical records and tests he reviewed. He opined that Diaz de Mora's left ankle and knee problems reached MMI on September 3, 2013. He noted that her left ankle examination at that time revealed she was pain free, had normal gait, no swelling, deformity, or tenderness, and she had full range of motion. Her left knee examination revealed full range of motion and minimal tenderness, and she was working full duty. Dr. Gammel stated there were no objective findings to support an assignment of any permanent partial impairment of the left foot/ankle and knee.

As for Diaz de Mora's lower back and left hip, Dr. Gammel noted that he personally treated her from May 10 through July 31, 2013. He stated that there was no evidence that Diaz de Mora complained of lower back or left hip problems during any visit, and that it was his practice to record such complaints in his notes if they are expressed to him. Further, if Diaz de Mora had complained of lower back pain or left hip pain, Dr. Gammel would have provided appropriate treatment for such complaints, and on all dates during which he treated Diaz de Mora, he "did not ever offer or provide any treatment to [her] for any low back or left hip problems." Dr. Gammel concurred with Dr. Ladd's opinion that Diaz de Mora's lower back and left hip complaints were not related to the May 9 accident, and "were not caused by any altered gait she may have had while she was wearing the boot for her left ankle fracture."

In explaining his opinion, Dr. Gammel described Diaz de Mora's "significant history of pre-existing low back and left hip problems ongoing from 2007 until just before the accident in May 2013." He went on to detail that history as already provided earlier in this opinion. He stated, "It must be noted that Ms. Diaz de Mora's hip/back complaints of pain before and after the accident on 9 May 2013 were essentially the same," as were her "complaints of limitations before and after the injury." Dr. Gammel concluded that Diaz de Mora's "left hip and low back complaints beginning on or about 3 September 2013 were related to her chronic left hip and back condition and were not related to her accident of May 9, 2013 and/or caused by any altered gait" from wearing the boot.

### (iii) Dr. Michael J. Morrison

Dr. Morrison performed an independent medical evaluation of Diaz de Mora on March 1, 2017. Diaz de Mora reported to him that she had not worked since April 2015 and she was currently living in Bellevue, Nebraska, with her daughter. She told Dr. Morrison that her left ankle fracture was treated with a "CAM walker," and that she subsequently "developed symptomology as a result of the use of the CAM walker and an abnormal gait, creating symptoms in her lower back and left hip. Diaz de Mora also described her issues related to her left ankle and knee.

As to Diaz de Mora's left knee, Dr. Morrison reviewed medical records and noted her preexisting problems with her left knee in 2009 and 2012. Based on his own examination, he concluded there was no evidence of any prepatellar bursal sac at that point, "only a preexisting soft tissue mass on the anterior aspect of her left knee which existed back to October 2009." He

found no evidence of exacerbation and concluded the May 2013 injury resulted in no permanent limitations to Diaz de Mora's left knee.

Regarding her lower back and left hip, Dr. Morrison stated that Diaz de Mora's present symptomology of her lower back had no correlation to the May 2013 injury, "specifically using a CAM walker which she states altered her gait temporarily." He pointed out that there was no mention of any lower back or left hip symptomology for 4 months following the workplace accident. He also noted her prior history of treatment for lower back pain going into her left leg. He listed her treatments in October and November 2012 with Dr. Boese, who diagnosed Diaz de Mora with "severe stenosis at L4-L5" and a "degenerative listhesis at that level" which was preexisting and symptomatic prior to the May 2013 accident. It was therefore Dr. Morrison's opinion that Diaz de Mora's lower back symptomology had "no correlation to the incident of May 9, 2013[,]" and he agreed with Dr. Ladd that she "suffers from chronic degenerative arthritis of her lower back." No further medical care to her lower back was necessary in relation to the May accident.

### (b) Functional Capacity Evaluations

Diaz de Mora was seen by Premier Therapy Associates for a functional capacity evaluation (FCE) on June 15, 2016. The physical therapist performing the FCE concluded Diaz de Mora could work at the sedentary physical demand level for 8 hours per day. Diaz de Mora was subsequently seen by Excel Physical Therapy on March 3, 2017, for a FCE. The physical therapist conducting that evaluation noted Diaz de Mora's prior FCE at Premier Therapy Associates in June 2016, and stated that he had "no explanation" for her lower functioning in that examination. The physical therapist concluded that Diaz de Mora was safe to perform work activities within the light-medium physical demand level. He noted that Diaz de Mora "was cooperative during the testing process and demonstrated fair effort," but that her "subjective complaints of pain appear[ed] out of proportion with her objective findings of dysfunction."

### (c) Trial Testimony

Diaz de Mora testified that she had been living in Mexico since April 2015; she moved there 5 days after quitting her job at GOP. She told her supervisor at GOP that "they had a family meeting and that due to the way she felt they had decided that she needed some time to rest and they had decided to go back to Mexico." One of the reasons she left for Mexico was because it was more economical to live there. For example, "[h]ealthcare over there is more economical"; however, while she was in Mexico in those first 6 months after she quit her employment with GOP, she did not seek any medical care for her work injuries. She also acknowledged that while she was working at GOP, she had health insurance which would have covered treatment for anything not covered by workers' compensation. Diaz de Mora returned to Omaha, Nebraska, in October 2015 so she could go to school and get her U.S. citizenship. She remained in Omaha until September 2016.

When asked why she told doctors she did not have problems with her lower back before the May 9, 2013, accident, Diaz de Mora stated that she "did not have problems with the low back before. . . . My problem was with the hip but it went away." Diaz de Mora claimed she told the

WorkFit doctor (Dr. Gammel) immediately after the May 9 accident that she had pain from her foot to the lower back. However, she admitted she did not tell her work supervisors anything about lower back problems because she did not notice it so much when she was working and she "never liked to give them more problems than they already had." During the first 2 months while she was wearing the boot, she acknowledged that she worked in the laundry where she sat all the time.

When asked about her reporting to Dr. Spangler that she did not have pain in her lower back or left hip before the May 9, 2013, accident, Diaz de Mora explained that sometimes the doctors were confusing "because some doctors say low back, some doctors say the hip and I don't know what it's referring to." She testified that she never had the type of pain she complained about to Dr. Spangler "at any time in her life" before the May 9 accident. She claimed the pain she had in 2012 was in her hip, and after she received an injection, it got better; she did not remember "having had back pain before." When told the medical records showed she had treatment for back pain in the past, Diaz de Mora said she did not remember it. An admission from her prior deposition was read into the record; when asked in her deposition whether she discussed her 2009 problems with her feet and 2012 problems with her left hip and lower back with Dr. Gammel or Dr. Spangler, Diaz de Mora responded "No." When asked why, she responded, "Since I was doing well and my problems began with the accident, I did not feel it was necessary to remember those things."

Diaz de Mora's work supervisor testified at trial that while Diaz de Mora was working in the laundry on modified duty for a couple months, he asked her every day how she was doing. He did not remember her saying anything about lower back or hip problems. When she returned to her regular position, she was asking for overtime. The supervisor spoke with Diaz de Mora approximately 2 weeks before she quit. She did not complain about back pain as a reason for leaving, nor did she ask to do something different at her job. She mentioned a family meeting and that "due to the way that she felt they had decided that she needed some time to rest and they had decided to go back to Mexico." The supervisor said that if Diaz de Mora would have asked for a change in her position, he would have considered it because she was a good employee. Diaz de Mora did not contact the supervisor after she returned to Omaha from Mexico.

Another GOP employee testified; he handled the "return-to-work process" for employees. He follows up with employees regarding any work restrictions "to assure that they are sent to a job that they can do." It was his understanding that when Diaz de Mora left it was "to go to Mexico for about six months to go rest." She did not report to this employee that she was having physical problems, nor did she ask him for help in finding something different to do at her job. This witness was asked about Diaz de Mora's specific physical limitations as described in the Premier FCE and testified that if those restrictions were appropriate, Diaz de Mora could perform the job of quality control (which she previously held). When Diaz de Mora left GOP, this employee told her that "we'll be here"; however, she never contacted him upon her return from Mexico.

4. WORKERS' COMPENSATION COURT AWARD

The compensation court issued its award on July 7, 2017. The court set forth a detailed summation of Diaz de Mora's medical history, consistent with this court's review of the record as set forth above. The court noted Diaz de Mora had returned to work "at her regular job duties on June 21, 2013," that the "reason for termination was marked as a voluntary quit with a checkmark

beside the reason 'Mexico'" and that "from the time of her full duty release to her last day of employment, [she] worked approximately 25 hours of overtime a week on average."

The compensation court looked at Dr. Escobar's opinion "with a certain amount of skepticism" because there was no indication that Dr. Escobar reviewed Diaz de Mora's medical history and the doctor "incorrectly noted that [Diaz de Mora] had not worked since the accident." Dr. Escobar did not acknowledge that Diaz de Mora "worked 65 hours a week at regular duty for about 22 months after the accident." The court also pointed out Dr. Escobar's reference to cervical and left shoulder injuries, and the court was "left to wonder how those unrelated diagnoses played into the doctor's opinion."

The compensation court also pointed out that Dr. Spangler's statements were made in reliance upon Diaz de Mora telling the doctor she "did not recall the current pain prior to the work injury." The court then set forth specific places in the medical records which demonstrate numerous instances of Diaz de Mora complaining of lower back and left hip pain, notably in the later months of 2012 just preceding the May 2013 accident. These are all detailed above in the background section. The court observed the similarities in how Diaz de Mora described her pain before and after the May 2013 accident, and also the similarities before and after regarding how there was an increase in pain when ascending stairs, while lying on her left side, and how she had decreased pain with walking. Because there was no indication that Dr. Spangler "was privy to this prior medical history," the court concluded this called into question the basis for her causation opinion. Citing to *Mutual of Omaha v. Broussard*, 233 Neb. 916, 448 N.W.2d 600 (1989), the court stated that an expert's opinion is only as good as the facts upon which it is based.

Further, as to Diaz de Mora's "altered gait theory," the court found the evidence showed that Diaz de Mora engaged in extremely limited walking from the time of her accident until her full duty release. While on light duty at work, "she would sit while performing her work duties, getting up only for breaks and lunch." The court noted that neither Dr. Escobar nor Dr. Spangler mentioned "antalgic gait," whereas, Dr. Gammel and Dr. Ladd "expressly opined that [Diaz de Mora's] left hip and low back complaints were not related to any antalgic gait she may have had while wearing the boot."

The compensation court found the opinions of Dr. Gammel and Dr. Ladd more persuasive, and both doctors concluded Diaz de Mora's lower back complaints "were a recurrence of her preexisting condition and unrelated to the accident." The compensation court found that Diaz de Mora "suffered a compensable accident and injury to her left ankle," but had "failed to sustain her burden of proving by a preponderance of the evidence that she injured her low back, left hip, and left knee as a result of a work-related accident on May 9, 2013." Diaz de Mora now appeals.

### III. ASSIGNMENTS OF ERROR

Diaz de Mora assigns the compensation court erred (1) by admitting certain medical opinions when determining Diaz de Mora did not suffer any injury to her lower back as a result of her work-related injury and (2) by characterizing a doctor's billing records as a "checklist" which lacked credibility or weight.

## IV. STANDARD OF REVIEW

An appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Tchikobava v. Albatross Express*, 293 Neb. 223, 876 N.W.2d 610 (2016). Determinations by a trial judge of the Workers' Compensation Court will not be disturbed on appeal unless they are contrary to law or depend on findings of fact which are clearly wrong in light of the evidence. *Id*.

Admission of evidence is within the discretion of the Workers' Compensation Court, whose determination in this regard will not be reversed upon appeal absent an abuse of discretion. *Id*.

## V. ANALYSIS

### 1. MEDICAL OPINIONS

Diaz de Mora claims the compensation court erred by admitting the opinions of Dr. Ladd, Dr. Morrison, and Dr. Gammel "in determining Diaz de Mora did not suffer any injury to her low back as a result of the accident on May 9, 2013." Brief for appellant at 13. We note that Diaz de Mora does not challenge the compensation court's determination that her left knee and left hip problems were not caused by the May 2013 injury; she limits her argument to the findings related to her lower back, and therefore our review is limited to that claimed injury. As to her lower back, she argues that the compensation court relied on the opinions of Dr. Ladd and Dr. Gammel and those opinions "share the same fatal flaw: they were made without a sufficient factual basis, relied on incorrect information and ignored the medical records of Dr. Boese." *Id*. She asserts, "The fact that [Diaz de Mora] had a degenerative spine condition does not preclude her from recovering benefits when the condition was asymptomatic prior to the accident but became symptomatic after the accident." *Id*. at 20. She claims that "the presence of mild, transitory lower back pain associated with a hip injury is not the 'same thing' as pain caused[d] by a spine injury," and that GOP "presented no clinical evidence to contradict this fact." *Id*. at 21. The gist of Diaz de Mora's argument is that those doctors who would not attribute her lower back pain to the May 2013 accident rendered flawed and inadmissible opinions which the court should not have received.

However, the admission of evidence is within the discretion of the Workers' Compensation Court, whose determination in this regard will not be reversed upon appeal absent an abuse of discretion. *Tchikobava v. Albatross Express, supra*. Further, if the nature and effect of a claimant's injury are not plainly apparent, then the claimant must provide expert medical testimony showing a causal connection between the injury and the claimed disability. *Id*.

We find no abuse of discretion by the compensation court in admitting these particular doctors' opinions. We initially note our agreement with GOP's assertion that that the compensation court did not rely on Dr. Morrison's opinion to determine whether Diaz de Mora suffered any injury to her lower back, and therefore the admission of Dr. Morrison's opinion cannot constitute reversible error. See *Griffith v. Drew's LLC*, 290 Neb. 508, 860 N.W.2d 749 (2015) (erroneous

admission of evidence not reversible error if other properly admitted relevant evidence sustains the court's necessary factual findings). The compensation court specifically stated that it was persuaded by the opinions of Dr. Ladd and Dr. Gammel, and both those doctors found Diaz de Mora's lower back complaints "were a recurrence of her preexisting condition and unrelated to the accident." Because the court did not rely on Dr. Morrison's opinion in determining Diaz de Mora did not suffer any injury to her lower back, we need not consider whether there are any deficiencies in Dr. Morrison's opinion. We therefore confine our discussion to the court's receipt of the reports authored by Dr. Ladd and Dr. Gammel.

### (a) Dr. Ladd

We first address Diaz de Mora's argument that Dr. Ladd's December 23, 2016, report is "based upon impermissible hearsay" because it contains the statement, "I understand that Ms. De Mora claims that her left low back and left hip problems began immediately after accident of May 9, 2013, and never went away, and that she told her physicians of those problems each time she was evaluated thereafter[.]" Brief for appellant at 14. Diaz de Mora claims that "[t]he source of this information is undisclosed; it is not in the medical record[,]" and "[a] physician cannot base his opinions on impermissible hearsay from an undisclosed source." *Id.*

However, the medical records show that on June 3, 2014, Diaz de Mora saw Dr. Ladd for evaluation and treatment of her lower back and left hip pain. On that day, Diaz de Mora reported to Dr. Ladd that her pain began after her May 9, 2013, work injury, and she claimed that her pain started due to a gait imbalance from wearing an ankle cast. Therefore, the record supports that Dr. Ladd was personally informed by Diaz de Mora that her pain began immediately after the May 2013 accident.

As to Dr. Ladd's comment that Diaz de Mora claimed to have told her physicians of these problems each time she was evaluated thereafter, it is clear that the statement itself did not form the basis of Dr. Ladd's medical opinion. And, the sufficiency of an expert's opinion is judged in the context of the expert's entire statement. *Zitterkopf v. Aulick Indus.*, 16 Neb. App. 829, 753 N.W.2d 370 (2008). When considering Dr. Ladd's opinion in its entirety, we conclude it was properly admitted.

Specifically, Dr. Ladd's December 23, 2016, opinion stated that Diaz de Mora's lower back condition was chronic in nature "due to longstanding degenerative stenosis at L4-L5 and L5-S1," and was "unrelated to anything that occurred on May 9, 2013." His opinion was based upon "her post-accident radiological studies, which reveal longstanding degenerative findings and no evidence of any acute injury." Dr. Ladd reached this opinion despite being told by Diaz de Mora that her lower back and left hip symptoms commenced immediately following her May 2013 accident; it was therefore irrelevant to Dr. Ladd's medical opinion whether she similarly reported this to other physicians.

Diaz de Mora also argues Dr. Ladd's report should not have been admitted because it "ignores Dr. Boese's medical report of November 26, 2012," which found her "lumbosacral conditions were asymptomatic." Brief for appellant at 14. However, Dr. Ladd was quite aware of Diaz de Mora's preexisting medical history. Of significance, he observed that following the May 2013 accident, the first mention of any left hip or lumbar complaint was made on September 3 to

- 13 -

Dr. Dunbar, which was "not quite four months out from her date of injury." To the extent she was having left hip or lower back problems immediately after the May 2013 accident, Dr. Ladd would have expected at least one of her providers to have recorded such complaints during "one or more of the numerous records created between May 9, 2013 and September 3, 2013." Due to the absence of such complaints in the medical records, he concluded the records did not support Diaz de Mora's assertion that she injured her left hip and lower back in May 2013.

Of further significance, Dr. Ladd pointed out that once Diaz de Mora began complaining of left hip and lower back problems, "her complaints were the same as the complaints she made before May 9, 2013." He said her "complaints are virtually identical to those recorded" before the May 2013 accident. Therefore, Dr. Ladd opined that Diaz de Mora suffered from chronic degenerative changes to her lumbar spine which caused the symptoms she experienced before her accident, and caused her to experience the same symptoms beginning approximately 4 months after her accident. He pointed out that Diaz de Mora "will potentially have intermittent flares of her pain and this would not be abnormal." Therefore, even if Diaz de Mora had become asymptomatic towards the end of 2012, based upon Dr. Ladd's opinion, it was possible she would have continued "flares" in the future.

Dr. Ladd's opinion is consistent with Diaz de Mora's medical records preceding the May 2013 accident. On November 16, 2012, a physical therapist documented that Diaz de Mora was still experiencing left-sided lower back pain, which was "still reproducible with pressure to the left L4/L5 facet joint." When Diaz de Mora saw Dr. Boese on November 26, he stated that Diaz de Mora's symptoms were under control, but she "would be on the Mobic indefinitely," for use as needed for pain. He also discussed the possibility of additional cortisone injections "if she has recurrent pain." Therefore, the fact that Diaz de Mora had her symptoms under control did not mean she was pain free, nor that the cause of her pain had been eliminated. Of greater import to Dr. Ladd was the 4-month delay after the May 2013 accident before the medical records showed Diaz de Mora reporting any problems with her lower back or left hip.

(b) Dr. Gammel

Diaz de Mora argues that Dr. Gammel's March 2, 2017, opinion "suffer[s] from the same weaknesses" because it ignores Dr. Spangler's causation opinion, "Dr. Ladd's original causation opinions which were contemporaneous with treatment," and Dr. Boese's findings. Brief for appellant at 14. However, Dr. Gammel's report sets forth a detailed summary of the medical records and tests he reviewed, which included Dr. Spangler's, Dr. Ladd's, and Dr. Boese's medical records, and where expressed, their opinions. Notably, Dr. Gammel specifically referenced Dr. Boese's conclusion in November 2012 that Diaz de Mora had reached MMI without impairment and was released to work without restrictions. Nevertheless, Dr. Gammel, like Dr. Ladd, found it significant that "Diaz de Mora's hip/back complaints of pain before and after the accident on 9 May 2013 were essentially the same," as were her "complaints of limitations before and after the injury." The record shows Dr. Gammel reviewed each of the records Diaz de Mora argues were ignored. The compensation court did not abuse its discretion by admitting Dr. Gammel's opinion.

- 14 -

(c) Summary

The compensation court did not abuse its discretion by admitting the expert opinions of Dr. Ladd and Dr. Gammel. Further, the court's reliance on their opinions in deciding Diaz de Mora's lower back complaints were not causally related to the May 2013 workplace accident is supported by the record. It was within the compensation court's discretion to rely upon Dr. Ladd's and Dr. Gammel's opinions over those provided by Dr. Spangler or Dr. Escobar. The compensation court is the sole judge of the credibility and weight to be given to medical opinions. *Tchikobava v. Albatross Express*, 293 Neb. 223, 876 N.W.2d 610 (2016). The compensation court is entitled to accept the opinion of one medical expert over that of another, and as the sole trier of fact, the compensation court is the sole judge of the credibility of the medical evidence and the weight to be given to it. *Kerkman v. Weidner Williams Roofing Co.*, 250 Neb. 70, 547 N.W.2d 152 (1996). Where the record presents nothing more than conflicting medical testimony, an appellate court will not substitute its judgment for that of the Workers' Compensation Court. See *Hintz v. Farmers Co-op Assn.*, 297 Neb. 903, 902 N.W.2d 131 (2017).

2. MEDICAL BILLS

Diaz de Mora contends that Dr. Ladd initially found that Diaz de Mora's symptoms and treatment were causally related to her May 2013 accident because his "medical bills reflected an accident date of 5/03/13 and made reference to needing 'permission' for a L5-S1 injection because it was 'WC'" and therefore the "bills confirm Dr. Ladd's position that [Diaz de Mora's] back pain was caused by her work-related injury." Brief for appellant at 21. The compensation court was not persuaded by this argument when it was made at trial. The court's July 7, 2017, order states:

Another attempt by [Diaz de Mora] to discredit Dr. Ladd's opinion was her argument that he had originally concurred with Dr. Spangler's causation opinion because his medical bill was submitted as employment related. . . . For the benefit of the reader, this national uniform Health Insurance Claim Form contains the question: "Is patient's condition related to:" with "yes" and "no" check boxes for the categories of "employment," "auto accident" and "other accident." Dr. Ladd's bills have the "employment" box checked "yes" and the other two marked "no."

Citing to *Liberty v. Colonial Acres Nsg. Home*, 240 Neb. 189, 481 N.W.2d 189 (1992), the compensation court pointed out that "higher Courts have expressed some dissatisfaction with opinions expressed by check-marks and cautioned that they should be examined as to lack of credibility or weight." The court stated it had "carefully reviewed Dr. Ladd's accompanying office notes" and these showed Diaz de Mora had been referred to him by WorkFit, where she had been treated for a work injury. Although the injury had been reported to him as a work-related injury, he "explicitly opined" that Diaz de Mora's "lumbar spine appeared to be chronic in nature." The compensation court stated, "His opinion was explained in greater detail in his subsequent letter to defense counsel rather than a change in opinion as [Diaz de Mora] argues." The court concluded, "Under these circumstances, the Court does not find Dr. Ladd's bill to be an opinion as to causation." We agree with the compensation court's consideration of this issue. Dr. Ladd's December 23, 2016, report explicitly stated the basis for his opinion as to the cause of Diaz de

Mora's lower back pain, and it was consistent with his reports from his assessment of Diaz de Mora in 2014. The compensation court was aware of the medical bills and forms and elected to rely on Dr. Ladd's more clearly stated opinion rather than the checkmarks noted on the forms. This was within the court's province to do so. Resolving conflicts within a health care provider's opinion also rests with the court, as the trier of fact. *Damme v. Pike Enters.*, 289 Neb. 620, 856 N.W.2d 422 (2014).

## VI. CONCLUSION

For the reasons set forth above, we affirm the decision of the compensation court.

AFFIRMED.